# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 11-2322

CHUN HUA ZHENG,

*Petitioner*,

*v.*

ERIC H. HOLDER, JR., Attorney General
of the United States,

*Respondent.*

Petition for Review of an Order of
the Board of Immigration Appeals.
No. A088-779-713.

ARGUED DECEMBER 14, 2011—DECIDED JANUARY 31, 2012

Before POSNER, MANION, and WOOD, *Circuit Judges*.

POSNER, *Circuit Judge*. The petitioner is a Chinese woman who applied for asylum and for withholding of removal on the ground that because of her opposition to China's "one child" policy she faces persecution if she is returned to China. She applied for asylum seven years after the expiration of the one-year deadline, see 8 C.F.R. § 1208.4(a)(2), and with only the most threadbare of

excuses, and so the Board of Immigration Appeals was on solid ground in rejecting her application for asylum.

Her application for withholding of removal, also denied by the Board, remains for consideration. The withholding of removal provision of the immigration law provides relief for asylum seekers who missed the one-year deadline; it states that "the Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. § 1231(b)(3)(A). (A person "who has been persecuted for . . . resistance to a coercive population control program, shall be deemed to have been persecuted on account of political opinion." 8 U.S.C. § 1101(a)(42).) This means, the Supreme Court has held in a notably loose interpretation of the statutory language, that the alien must "establish by objective evidence that it is more likely than not that he or she will be subject to persecution upon deportation." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 430 (1987); see *Benitez Ramos v. Holder*, 589 F.3d 426, 431 (7th Cir. 2009); *Viridiana v. Holder*, 646 F.3d 1230, 1239 (9th Cir. 2011). (The Court meant "subjected," not "subject.")

A regulation provides that "if the applicant [for withholding of removal] is determined to have suffered past persecution in the proposed country of removal on account of . . . political opinion, it shall be presumed that the applicant's life or freedom would be threatened

in the future in the country of removal on the basis of the original claim." 8 C.F.R. § 1208.16(b)(1)(i). Zheng argues that she was persecuted in China because of her opposition to the "one child" policy. If she is right (the Board ruled that she was wrong), she is entitled to the presumption.

She lived in Fujian Province. Her cousin became pregnant, and because the cousin was not married family planning officers (three in number) came to her home to arrest her, perhaps intending to force her to have an abortion because in Fujian Province women are "not allowed to give birth out of wedlock." Immigration and Refugee Board of Canada, "China: Treatment of Pregnant, Unmarried Women by State Authorities, Particularly in Guangdong and Fujian; Whether Unmarried Women Are Obliged to Undergo Pregnancy Tests by Family Planning Officials," June 23, 2009, www.irb-cisr.gc.ca:8080/RIR_RDI/RIR_RDI.aspx?l=e&id=452415 (visited Jan. 3, 2012). Zheng happened to be visiting the cousin when the officers arrived, and she forcibly resisted their effort to seize the cousin. The officers responded by kicking, beating, and cursing her. She was bruised, and to an undetermined extent bloodied. The family planning officers called the police, who came and arrested her, and she was in jail for three days and while there was beaten twice. Apparently she didn't seek medical attention for any injuries inflicted by the assaults, but we do not know whether it would have been feasible for her to do so; we are not informed about the conditions and availability of medical care for persons in her situation in Fujian Province.

Upon releasing her from jail (no charges having been filed), the police instructed her to report back to them every week—we don't know why. She did this for three weeks; she testified that the police abused her verbally on her visits. She then fled the country (that was in 1999) and came to the United States, where she married and gave birth to two children, who apparently (as is not uncommon among Chinese emigrants) are at present living with their grandparents in China. She fears that if returned to China she will be forcibly sterilized for having had two children. Her cousin and her father have written her that she will be "punished" if she returns, but the letters don't indicate what the writers think the punishment will be.

The initial question is whether she's proved that the beatings were persecution, because if they were she gets the benefit of the presumption. The immigration judge, the Board, and the government in its brief all point out that worse beatings than Zheng received have been held not to constitute persecution, but the cases are all over the lot and this court's "worse beatings" cases, at least, are distinguishable. In *Zhu v. Gonzales*, 465 F.3d 316 (7th Cir. 2006), for example, the applicant for relief, who was the boyfriend of a woman sought for violating the one-child policy, was hit with a brick by angry family planning officers who went to his home, looking for the girlfriend. But it was an isolated incident; he was not arrested, or otherwise molested.

The beating that Zheng received in her cousin's home was, as far as we are able to glean from the scanty

record, the consequence of her forcibly resisting her cousin's arrest. A person injured resisting the arrest of another person is not necessarily a victim of persecution, even if that other person is. *Lin v. Attorney General*, 555 F.3d 1310, 1316-17 (11th Cir. 2009). Zheng may have been resisting her cousin's arrest in an effort to protect her cousin rather than because of opposition to the government's policy. But she says she opposed it, and the immigration judge deemed her credible. Still, there is a "difference between opposing a policy, and the tactics to which one resorts in opposing it. However abhorrent China's one-child policy may be, it would not be persecution for China to have jailed the petitioner had she assaulted the family-planning officers . . . when they forced an entrance to her cousin's house." *Li v. Holder*, 612 F.3d 603, 606 (7th Cir. 2010) (citations omitted); see also *Gao v. Holder*, 429 Fed. App'x 64 (2d Cir. 2011) (per curiam). In the United States, and we imagine in virtually all other countries, it is a crime to resist an arrest violently even if it is an unlawful arrest; for there are legal remedies against false arrest.

The beatings that Zheng received in jail may have been motivated by her opposing the government's family planning policy, but may instead have reflected the sadism or misogyny of police or jail guards (*Zhu v. Gonzales* likewise may have involved an isolated instance of police out of control), or anger at her for having fought with the family planning officers. She testified that during the three-day detention the guards had "scolded me all along saying that I was resisting against the national law and in the public place—and also violate the

national law in public, and also insulted the law." The precise force of "resisting," "violat[ing]," and "insult[ing]" is unclear, but it could be "forcibly resisting."

The lack of compelling evidence that the motivation for the beating was her opposition to China's coercive population control program is a more important consideration in an evaluation of her claim of persecution than that she did not seek medical treatment and apparently was not badly hurt. Beating a woman (if the motivation is one of the grounds for persecution in 8 U.S.C. § 1231(v)(3)(A) that forbids removal of the victim, including "political opinion," which in turn includes resistance to China's one-child policy) crosses the line that distinguishes persecution from mere harassment. The Board having failed to define persecution, we've suggested that it "involves . . . the use of *significant* physical force against a person's body, or the infliction of comparable physical harm without direct application of force (locking a person in a cell and starving him would be an example), or nonphysical harm of equal gravity." *Stanojkova v. Holder*, 645 F.3d 943, 948 (7th Cir. 2011) (emphasis in original). That the physical force need not be so great as to inflict a serious injury is illustrated by *Beskovic v. Gonzales*, 467 F.3d 223, 224 (2d Cir. 2006), where the petitioner claimed that he had been "arrested by Serbian police, detained, interrogated, and beaten on two separate occasions . . . [and that] the Serbian authorities took these actions because they believed him to be associated with the Kosovo Liberation Army ('KLA'). His detentions lasted two to three hours, during which the Serbian police interrogated and physi-

cally abused him." The court thought beating (as distinguished from the technical battery that consists of any offensive touching of a person's body) quite likely to cross the line that separates harassment from persecution, *id*. at 226, but the ground for the beating (it must be one the grounds listed in section 1231(b)(3)(A)) is critical, and is opaque in this case.

Without the benefit of the presumption based on past persecution, an applicant for withholding of removal may have a very tough row to hoe. Because illegal aliens tend to be impecunious, or at most only moderately prosperous, they do not have the resources to commission experts to conduct systematic studies of the conditions in their country of origin that they will confront if they are sent back. At best they can point to such studies as may already exist. But we haven't found systematic studies of how China nowadays administers its one-child policy, either generally or in the particular case of a woman who returns to Fujian Province after having given birth to more than one child in the United States, and who having come from Fujian must return there if she is removed from the United States; the government does not suggest that Zheng would be permitted to return or relocate to another province.

At the oral argument we were told by Zheng's lawyer that the Australian government has conducted the kind of studies we're looking for, but all that we have been able to find are short reports by the Australian Refugee Review Tribunal, which reviews decisions regarding

refugee visas, in response to questions that arise in the course of the tribunal's work. The reports cull information from various sources, including legislation and policy statements of the country in question, our State Department's country reports, and reports of the United Nations High Commissioner for Refugees. The Tribunal's reports contain anecdotal evidence of human rights abuses by Chinese family planning officials, but we can find no data on how frequently returning violators are persecuted, as by being subjected to forced sterilization—the kind of data an alien seeking withholding of removal will often need in order to prove that she is more likely than not to be persecuted if she is returned to her country of origin.

The Tribunal's reports point out that forced sterilizations and abortions are not official provincial (or national) policy in China and appear to have become rare. See, e.g., Refugee Review Tribunal Australia, "RRT Research Response: HN34917, China," June 16, 2009, www.mrt-rrt.gov.au/ArticleDocuments/71/chn34917.pdf.aspx (visited Jan. 3, 2012); see also "Women's Rights and China's New Family Planning Law: Roundtable Before the Congressional-Executive Commission on China on Women's Rights and China's New Family Planning Law," 107th Cong., 2d Sess. 4, 7-10, Sept. 23, 2002 (Statement of Bonnie Glick), www.gpo.gov/fdsys/pkg/CHRG-107shrg82487/pdf/CHRG-107shrg82487.pdf (visited Jan. 3, 2012). According to the State Department, Fujian is not one of the provinces that "require 'termination of pregnancy' if the pregnancy violates provincial family-planning regulations," but instead merely "require[s]

unspecified 'remedial measures' to deal with unauthorized pregnancies." U.S. Department of State, *2009 Country Reports on Human Rights Practices: China* § 1(f) (Mar. 11, 2010)**.** Couples returning to China with children born abroad may be fined, see, e.g., *Zheng v. Mukasey*, 546 F.3d 70, 72 (1st Cir. 2008) (per curiam), and as noted in *Lin v. Mukasey*, 532 F.3d 596 (7th Cir. 2008), these fines (called "social compensation fees") are stiff—often beyond the violators' ability to pay. But we don't know what happens if they don't pay. And some officials in Fujian Province apparently believe that children born abroad should not be counted against the one-child limit. *Zheng v. Mukasey*, *supra*, 546 F.3d at 73.

We need evidence-based law, just as we need evidence-based medicine. *United States v. Garthus*, 652 F.3d 715, 720 (7th Cir. 2011); *Zenith Electronics Corp. v. WH-TV Broadcasting Corp.*, 395 F.3d 416, 419 (7th Cir. 2005); see also *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 380 (5th Cir. 2010). Zheng has no feasible way of determining how likely it is that she'll be persecuted if she is returned to Fujian Province. One would like the Department of Justice, of which the Immigration Court and the Board of Immigration Appeals are subordinate bodies, to assemble and collate the existing bodies of data and offer an expert opinion on the likelihood of persecution of Chinese women returned to Fujian Province having fled the country because of opposition to Chinese family planning policy or an altercation with family planning officials and having given birth to more than one child in the United States. The analytical effort might fail because of the fog that surrounds conditions in Fujian

Province—a province with a population of more than 35 million. But it should be attempted, as it has not been. We suggested in *Banks v. Gonzales*, 453 F.3d 449, 453-55 (7th Cir. 2006), and repeat, that the Board of Immigration Appeals (or perhaps the Department of Homeland Security, which handles asylum cases until an immigration judge gets involved, and presents the evidence to that judge) adopt in asylum cases the equivalent of the vocational experts used by the Social Security Administration in disability cases and maybe even the "Grid" that the Administration uses to expedite and systematize administration, so that recurrent issues, such as requests for asylum or withholding of removal by aliens claiming to face persecution for violating Chinese family planning laws, can be handled uniformly.

On the basis of the skimpy record, supplemented by our own research, we cannot fault the immigration judge or the Board for concluding that Zheng has not proved that it is more likely than not that she will be persecuted if she returns to China. The petition for review is therefore

DENIED.